UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JAMES L. RAMEY | ) | Case No. 10-13756-SSM |
| BARBARA A. RAMEY | ) | Chapter 7 |
| | ) | |
| Debtors | ) | |
| | ) | |
| ANNE NASH-BONE | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 10-1297 |
| | ) | |
| JAMES L. RAMEY, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**

This is an action to determine the dischargeability of a debt arising from a $50,000 loan made by the plaintiff, Anne Nash-Bone, to the defendants, James L. Ramey and Barbara A. Ramey.  Although the loan was secured by a deed of trust against a townhouse owned by the defendants, the deed of trust was not recorded, and the townhouse was sold about two months later without repayment of the loan.  Later, Ms. Nash-Bone agreed to extend the time for payment on the debtors' agreement that the loan would continue to be "backed" by the deed of trust.  A trial was held on March 10, 2011.  The plaintiff was present in person and represented herself.  The defendants were present in person and were represented by counsel.  For the reasons stated, the court determines that the debt is nondischargeable.  This opinion constitutes

1

the court's findings of fact and conclusions of law under Rule 7052, Federal Rules of

Bankruptcy Procedure, and Rule 52(a), Federal Rules of Civil Procedure.

Background and Findings of Fact

James L. Ramey and Barbara A. Ramey filed a joint petition in this court on May 6,

2010, for relief under chapter 7 of the Bankruptcy Code.  They received a discharge of their

dischargeable debts on August 18, 2010.  On their schedules, they listed a total of $95,165 in

unsecured debts, of which $50,000 consisted of a personal loan from Anne Nash, the plaintiff.

The trustee determined that there were no assets available for payment of claims and filed a

report of no distribution on September 21, 2010.

The loan at issue was made on or about February 5, 2007.  Ms. Nash-Bone (then known

as Anne Nash) testified that she was often approached by a title company to offer second or third

mortgages.  She explained that she agreed to make the loans in order to supplement her income

with the interest payments, and that the employees of the title company prepared the

documentation for her.  She has made approximately seventeen mortgage loans, but the loans to

the Rameys were the first ones in which she was approached directly by the borrower, without

involvement by the title company.

Ms. Nash first loaned money to the Rameys in 2002.  That loan was for $30,000, secured

by the Rameys' residence on Balch Spring Circle in Leesburg, Virginia, and was paid in full in

2004. Ms. Nash-Bone had thought that the deed of trust for that loan had been recorded and was

surprised to discover when the note was paid off that it had not been.  The Rameys testified, and

Ms. Nash-Bone did not deny, that when she realized that the deed of trust had not been recorded,

she told them that she was not worried about her loan to them since she trusted them.

2

Ms. Ramey reached out to Ms. Nash-Bone for a loan again in 2007.  The Rameys met Ms. Nash-Bone at her home on February 5, 2007, and asked for the $50,000 loan.  Ms. Nash-Bone testified that the Rameys presented her with a signed and notarized deed of trust and note. The note (captioned "Balloon Note") provided for interest at 9%, with interest-only payments of $375 per month for one year, at which time the entire balance would be due.  The deed of trust (captioned "Purchase Money Deed of Trust")[1] encumbered a townhouse that the debtors owned on Radford Terrace in Leesburg, Virginia.  There is no dispute that the townhouse was on the market and listed for sale at the time the loan was made, but the testimony is sharply conflicting as to whether Ms. Nash-Bone was advised of that fact.  She testified that she was not told that the property was on the market and that she would not have made the loan had she known that it was.  The Rameys, on the other hand, both testified that they told Ms. Nash-Bone that the property was for sale, and that she had expressed concern over the prospect of an early payoff of her loan and preferred a long-term loan that would give her more interest payments.  In response, according to the Rameys, they agreed to substitute their residence on Balch Spring Circle as the collateral for this loan, as they had done with the first loan. They nevertheless signed the deed of trust on the Radford Terrace property with the expectation, they testified, that a later deed of trust would be prepared against their residence.  A new deed of trust was never prepared, however, and the Rameys testified that they assumed that Ms. Nash-Bone was continuing in the trusting, casual manner that she had exhibited with the first loan.

The original note and deed of trust were left with Ms. Nash-Bone, who kept them in her possession.  She did not take any steps to record the deed of trust because she assumed that it had

---

[1]  The title is of course a misnomer, since the loan was not used to purchase the property.

been recorded and in any event thought that the notarization of the documents made them legally

binding.  Both of the Rameys testified that they were not aware whether the documents had been

recorded, and that recordation of the documents was never discussed, further bolstering their

understanding that Ms. Nash-Bone was treating the loan casually.

The Radford Terrace property was sold later in the spring of 2007.  The Rameys never

informed Ms. Nash-Bone of the property's sale.  Ms. Nash-Bone testified that, if she had known

of the sale, she would have requested $50,000 of the proceeds to pay off her loan since she

would no longer have collateral.  The Rameys testified that they did not alert her to the sale

because they did not believe she was relying on the property as collateral when she provided the

loan; and  they understood her to be dealing with their loan casually, based on her trust of them.

Following the sale of the Radford Terrace property, the Rameys continued to make the

interest-only payments of $375 per month.  They did not pay the note off when it became due in

February 2008 but simply continued making interest payments.  Ms. Nash-Bone testified that she

did not object because she was in France for much of that spring assisting her elderly mother and

had not noticed that the loan had come due.  In August 2008, however, the Rameys' check did

not clear the bank because their account had been frozen by the IRS.  Ms. Nash-Bone testified

that she then contacted the Rameys' son, attorney Steve Shebest, who helped his parents provide

a replacement check to Ms. Nash-Bone.

On September 8, 2008, Ms. Ramey requested a three-year extension of the loan in a letter

to Ms. Nash.  In a reply dated September 11, 2008, Ms. Nash wrote: "This is to confirm that I

accept to extend your loan for three years at the most, with the same conditions as stipulated in

the Note established on the 5th of March 2007 and backed by a Deed of Trust of the same date."

Ms. Nash signed her letter as "Lender," and both of the Rameys signed as "Borrowers."  At the

time of the extension, the Rameys did not advise Ms. Nash-Bone that the Leesburg property had

already been sold.  Ms. Ramey testified that she had fallen ill in September 2008 and spent six

weeks at a time over the course of the fall in Arkansas undergoing treatments.  She further

testified that she just signed Ms. Nash-Bone's letter accepting the extension of the loan without

reading it, and Mr. Ramey testified that he glanced over it but did not read it in its entirety before

he signed it.  He testified that he was not concerned by the reference to the deed of trust on

property he no longer owned, but instead was solely concerned with his wife's health.  Later,

Mr. Ramey contacted Ms. Nash-Bone, who agreed to lower the payments to $300 per month.

The Rameys continued to make the lowered payments until late 2009 or early 2010.  As noted,

they filed their bankruptcy petition in May 2010.  Ms. Nash-Bone testified that it was only after

reviewing the bankruptcy filing that she learned the Rameys no longer owned the Radford

Terrace property.

<u>Conclusions of Law and Discussion</u>

I.

Ms. Nash-Bone asserts that the Ramey's liability to her is excepted from discharge as a

debt arising from false representations, false pretenses, or actual fraud.  This court has subject-

matter jurisdiction under 28 U.S.C. § 1334 and 157(a) and the general order of reference from

the United States District Court for the Eastern District of Virginia dated August 15, 1984.  A

determination of dischargeability is a core proceeding in which a final judgment or order may be

entered by a bankruptcy judge.  28 U.S.C. § 157(b)(2)(I).  Venue is proper in this district under

28 U.S.C. § 1409(a).  The defendants have been properly served and have appeared generally.

II.

A chapter 7 discharge does not discharge an individual debtor from certain types of

debts. Among these are debts—

> for money, property, services, or an extension, renewal, or refinancing of credit,
> to the extent obtained by—
>     (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition; [or]
>     (B) use of a statement in writing—
>         (i) that is materially false;
>         (ii) respecting the debtor's or an insider's financial condition;
>         (iii) on which the creditor to whom the debtor is liable for such
> money, property, services, or credit reasonably relied; and
>         (iv) that the debtor caused to be made or published with intent to
> deceive[.]

§ 523(a)(2), Bankruptcy Code. The burden of proof is on the objecting creditor, and the standard

of proof is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112

L.Ed.2d 755 (1991).

A.

Because different standards apply, it is first necessary to determine whether the

misrepresentations on which the plaintiff relies are ones "respecting the debtor's . . . financial

condition." § 523(a)(2)(B), Bankruptcy Code. If so, the misrepresentation must be in writing to

be actionable, and the creditor must have reasonably relied on it. *Id.* Otherwise, a

misrepresentation may be oral or simply implied, and the creditor's reliance need only have been

justifiable, which is a lesser standard than reasonable reliance. § 523(a)(2)(A), Bankruptcy Code;

*Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

The misrepresentations asserted by the plaintiff are two: first, a failure at the time the

loan was made to disclose that the property given as security was listed for sale; and second, the

6

representation at the time the due date was extended that the property would continue as security.

The Fourth Circuit has held that a "statement respecting financial condition" is not restricted to

formal documents such as a balance sheets or profit and loss statements, and the like.  *Engler  v.*

*Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1060-61 (4th Cir. 1984) (false oral

statement that collateral being offered as security was unencumbered was a statement concerning

the debtor's financial condition and was therefore not a basis for holding the debt

nondischargeable because it was not in writing as required by Sec. 523(a)(2)(B)).  Whether the

holding in *Van Steinburg* is limited to misrepresentations with respect to the value (as opposed to

ownership) of collateral is unclear in light of the later opinion in *Foley & Lardner v. Biondo (In*

*re Biondo)*, 180 F.3d 126 (4th Cir. 1999).  In that case, the debtors, in negotiating a settlement of

fees owed to a law firm, assigned as security their distribution rights from limited partnership

interests they no longer owned, representing in a written security agreement that they were "sole,

lawful, legal, and beneficial owners" of the partnership interests.  *Id.* at 130.  Without

specifically addressing the distinction between the two provisions, the Fourth Circuit analyzed

dischargeability under the "actual fraud" standard of § 523(a)(2)(A) rather than under the false

written statement standard of § 523(a)(2)(B).  *Id.* at 133-136.  The actual fraud standard, the

court explained, requires a plaintiff to prove "(1) a fraudulent misrepresentation; (2) that induces

another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's

justifiable reliance on the misrepresentation."  *Id.* at 134.

III.

With respect to the making of the loan in the first instance, the court determines that

analysis properly proceeds under § 523(a)(2)(A), since the misrepresentation upon which Ms.

7

Nash-Bone relies does not involve the value of the collateral being offered, but rather the failure to inform her that it had been listed for sale. As a threshold matter, the court must resolve the conflicting testimony, since the Rameys insist they *did* inform Ms. Nash-Bone of the impending sale; that there was an agreement to substitute their residence as collateral when the townhouse was sold; and that the substitution was never followed up because they believed that Ms. Nash-Bone was the treating the loan informally. Having considered both the content of the testimony and the demeanor of the witnesses, the court finds Ms. Nash-Bone's testimony to be the more believable, and the court therefore finds that the Rameys did not tell her that the property was on the market.

The next issue is whether there was a misrepresentation. Certainly, there was no express representation of anything. However, "fraud may be committed by artful silence as well as by an affirmative misrepresentation." *Crosspointe Trs., LLC v. Lucash (In re Lucash)*, 370 B.R. 664, 669 (Bankr. E.D. Va. 2007). The offer of a specific piece of real property as collateral for a one-year loan would normally be understood as a representation, not only that the borrowers had title to the property–although the deed of trust the Rameys signed contains no warranty of title–but also that there was no immediate plan to dispose of it. Had Ms. Nash-Bone known the Rameys intended to sell the property prior to the maturity of her loan, she could have protected herself either by recording her deed of trust or by insisting on different or additional collateral. Although an unrecorded deed of trust is valid against the party who gave it, it is not enforceable against a bona fide purchaser. Of course, there are good reasons to record a deed of trust regardless of whether the property is likely to be sold before the loan matures. For example, another creditor might obtain a judgment against the borrower that would become a lien against

8

the property, and the lien of that judgment would be superior to any unrecorded deed of trust.

And if the borrower were eventually to file for bankruptcy, the unrecorded deed of trust would

be unenforceable against the bankruptcy trustee.  § 544(b), Bankruptcy Code; *Wells Fargo

Funding v. Gold*, 432 B.R. 216 (E.D. Va. 2009).

The court does agree with the Rameys that there was no duty on their part to record the

deed of trust for Ms. Nash-Bone.  Recording a deed of trust is normally the responsibility of the

lender, not the borrower, unless the borrower has expressly undertaken to perform that task.  No

evidence was presented that the Rameys told Ms. Nash-Bone that they would record the deed of

trust or that they made any statement to her that would have misled her into believing that the

deed of trust either had been, or did not need to be, recorded.  On the other hand, since they were

aware that Ms. Nash-Bone had not recorded the deed of trust for the earlier loan, they may well

have anticipated she would not record the new deed of trust either, thereby leaving them free to

sell the property without having to pay off the loan prior to its maturity.  To be sure, there is no

evidence that the Rameys did not intend to repay the loan when it became due.  But good

intentions cannot obscure the fact that the sale of the collateral dramatically increased the risk to

Ms. Nash-Bone of ultimately (as occurred here) not getting paid.

There remains the issue of reliance.  There is no question that Ms. Nash-Bone relied on

the implied representation that the property would stand as security for her loan until it was

repaid, and that she would not have made the loan without some form of security.  As the

Supreme Court explained in *Field v. Mans*, a person may be "justified in relying on a

representation of fact 'although he might have ascertained the falsity of the representation had he

made an investigation.'"  516 U.S. at 70, 116 S.Ct at 444 (1995) (quoting RESTATEMENT

9

(SECOND) OF TORTS § 540 (1976)).  Additionally, "contributory negligence is no bar to recovery

because fraudulent misrepresentation is an intentional tort."  *Field v. Mans*, 516 U.S. at 70, 116

S.Ct. at 444 (1995).  At the same time, a person is "'required to use his senses, and cannot

recover if he blindly relies upon a representation the falsity of which would be patent to him if he

had utilized his opportunity to make a cursory examination or investigation.'"  *Id.* at 71, 116

S.Ct. at 444 (1995) (quoting RESTATEMENT (SECOND) OF TORTS § 541 cmt. a (1976)).  In this

case, even though Ms. Nash-Bone was, by any objective measure, negligent in not ensuring or

verifying that the deed of trust was recorded, the court nevertheless finds that her reliance on the

implied representation that the debtors had no immediate plans to sell the collateral from under

her was justifiable.  Accordingly, the court determines that the Ramey's intentional failure to

disclose the impending sale of the property they had offered as collateral is sufficient under §

523(a)(2)(A) to except the debt from discharge.

IV.

But even if the court were unable to find that the failure, at the time the loan was made, to

disclose that the Rameys were in the process of selling the property constituted a false

representation sufficient to bar discharge of the debt, the court would have to find such a

misrepresentation at the time Ms. Nash-Bone agreed to extend the maturity of the loan and allow

the Rameys to continue making interest-only payments.  Although a false statement made *after* a

loan has been funded cannot transform a dischargeable debt into a nondischargeable one, a false

statement that is relied on by the creditor in extending the time for payment of an existing debt is

sufficient to bar discharge of the debt.  *Biondo*, 180 F.3d. at 132 (explaining that the term

"extension . . . of credit" as used in § 523(a)(2) is "properly viewed as merely an agreed

10

enlargement of the time allowed for payment.")  As noted, the document signed by the Rameys

recited that Ms. Nash-Bone "accept[ed] to extend your loan for three years at the most, with the

same conditions as stipulated in the Note established on the 5th of March 2007 *and backed by a*

*Deed of Trust of the same date*." (emphasis added).  Given the Rameys' familiarity with real

estate transactions, the court does not find their testimony that they were so distracted by

Barbara Ramey's health problems that they did not notice the reference to the deed of trust in the

one sentence document to be credible.  And they clearly knew that the loan was no longer

"backed" by a deed of trust, since the property to which it related had been sold long before.

However, the question remains as to whether the appropriate standard of reliance has

met.  As discussed, if a misrepresentation relates to the debtor's financial condition, the

creditor's reliance must have been reasonable, which is a higher level than the justifiable reliance

required for misrepresentations as to other kinds of facts.  *Mester v. Brevard (In re Brevard)*, 200

B.R. 836 (Bankr. E.D. Va. 1996).  Stated in its simplest terms, the test for reasonable reliance

"is one of objective reasonableness, taking into account all the circumstances."  *Id.* at 846.  In the

case of lending institutions, "this standard is expanded to compare the creditors' actual conduct

with debtor; the industry-wide practice; and the surrounding circumstances of the case."  *Branch*

*Banking & Trust Co. v. Adam (In re Adam)*, 406 B.R. 717, 721 (Bankr. E.D. Va. 2009).

Although an argument could certainly be made that a representation as to continued ownership

of an asset upon which a creditor is relying for payment is a representation respecting the

debtor's financial condition, both the Supreme Court, in *Field v. Mans*, and the Fourth Circuit, in

*In re Biondo*, treated that kind of representation as requiring only justifiable reliance.  In *Field v.*

*Mans*, a seller of real property to the debtor had taken back a second mortgage for a portion of

the purchase price.  516 U.S. at 61, 116 S.Ct. at 439 (1995).  The mortgaged property was

subsequently conveyed in violation of a due-on-sale clause.  *Id.* at 61-62, 116 S.Ct. at 439.  The

next day the debtor wrote the seller asking him to waive the due-on-sale clause without

disclosing that the property had already been conveyed.  *Id.* at 62, 116 S.Ct. at 440.  The debtor

and the seller could not agree on the terms of a waiver, and the seller did not learn of the

conveyance until some years later, when the value of the property had declined to the point that

the mortgage had no value.  *Id.*  It was in that context that the Supreme Court held that the

required level of reliance for the failure to disclose that the property had already been conveyed

was justifiable rather than reasonable.  *Id.* at 74, 116 S.Ct. at 446.  And, as previously noted, in

*Biondo* the Fourth Circuit applied a justifiable reliance standard with respect to the debtors'

pledge of partnership interests they no longer owned.  180 F.3d at 134 (4th Cir. 1999).  For that

reason, the court determines that Ms. Nash-Bone need only demonstrate justifiable rather than

reasonable reliance.[2]  That standard is easily met in the circumstances of this case.  Nothing in

the facts known to her would have made it obvious that the debtors no longer owned the property

that she was relying upon as security for the repayment of the loan.

## V.

There remains, finally, the issue of damages.  Although the evidence establishes that the

principal amount of the loan was never repaid, the date to which interest was paid before the

---

[2]  The distinction is of some importance, because the court would have difficulty finding that
reliance on the debtor's continued ownership of the property was objectively reasonable, since
Ms. Nash-Bone had not recorded the deed of trust, had not been told by the debtors that it had
been recorded, and simply assumed that notarization was sufficient to protect her interests,
which would have been true only if the debtors continued to own the property, did not further
encumber it, had no judgments entered against them, and had not filed bankruptcy.

payments went into default is far from clear.  Accordingly, the court will award prejudgment

interest at the note rate only from the date of the bankruptcy petition.  Post-judgment interest will

accrue at the federal judgment rate.  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 632

(4th Cir. 1999).

      A separate judgment will be entered consistent with this opinion.


Date: _____          _____
                                                                       Stephen S. Mitchell
Alexandria, Virginia                                      United States Bankruptcy Judge


Copies to:

Anne Nash-Bone
204 Eagleton Estates Blvd
Palm Beach Gardens, FL 33418
Plaintiff *pro se*

Gregory H. Counts, Esquire
Tyler, Bartl, Ramsdell & Counts, PLC
300 North Washington St. Suite 202
Alexandria, VA 22314-4252
Counsel for the defendants